In the Matter of the Estate of ELBRIDGE GERRY SNOW, Deceased.

Surrogate's Court, New York County, April 21, 1930.

*Wherry & Wight* [*Thomas H. Wight* and *James C. Forsyth* of counsel], for the petitioner.

*Cardozo & Nathan*, for the executor.

*Cabell, Ignatius & Lown* [*Blaine F. Sturgis* of counsel], for Elbridge Snow, Jr., Janet S. Monroe and Dorothy Brush.

*Donald R. Baldwin*, special guardian.

O'BRIEN, S. This is an application by Fanny Joyce Snow, decedent's widow, to compel the trustees of this estate to pay to her out of the *principal* of the trust created by his will for her benefit the sum of *$17,000* per annum for her support, comfort and maintenance *in addition to the net income of the trust which is approximately $8,700 per annum*. Decedent and petitioner married *November 26, 1921*, at which time he was eighty years of age and she was forty-five years of age. He had been previously married and Elbridge G. Snow, Jr., the contingent remainderman hereinafter referred to, is a son by decedent's former marriage. *Decedent's will was executed on August 18, 1922. Decedent died November 7, 1925.* He left surviving a son, Elbridge Gerry Snow, Jr., two granddaughters, Dorothy V. Brush and Janet Gerry Monroe, daughters of Elbridge Gerry Snow, Jr., and a great-grandson, a grandson of Elbridge Gerry Snow, Jr. In the 2d paragraph of his will he bequeathed to the petitioner, Fanny Joyce Snow, the sum of $25,000 " in addition to any and all securities which I may have given or transferred to her during my lifetime." He also bequeathed to her " all the books, pictures, silverware and household furniture now located in the premises No. 180 West 59th Street, New York City, and all jewels and jewelry owned by me, including any and all watches, and also one of my automobiles which she shall select from those owned by me." Moreover in said will he devised to her his property in the city of St. Augustine, Florida, " recently purchased by me, commonly known as Number 44 Bay Street, St. Augustine, Florida, together with all the books, pictures, silverware and household furniture therein contained, and also the parcel of land adjoining the same, recently purchased by me." By the 10th paragraph of his will he disposed of the residue of his estate in the following manner:

" *Tenth.* I give, devise and bequeath unto the American Exchange National Bank of the City of New York, one equal one-half part of all the rest, residue and remainder of my personal estate and one equal one-half part of all of my real estate not otherwise devised in this my last Will and Testament, but in trust nevertheless, and upon the uses and trusts following, namely:

" To receive, hold and, as often as may be necessary, reinvest

the same and collect and receive the income arising therefrom and to apply and pay over, quarterly in each calendar year, such interest and income to and for the use of my wife, Fanny Joyce Snow, for and during her life, and upon her death to transfer and pay over the amount of my said residuary estate remaining in its possession and transfer and convey any real estate then remaining unconverted in its possession, together with any increment or increase thereof, unto my son Elbridge Gerry Snow, Jr., if he shall then survive my said wife. If, at any time, the interest and income arising from the said trust estate shall not be sufficient for the proper support, comfort and maintenance of my said wife, then, and in that event, I direct, authorize and empower my said trustee to appropriate and make such payments out of the principal of the said trust estate as in its discretion shall be deemed necessary and proper for her liberal and generous support, comfort and maintenance. In the event that my said son shall not survive my said wife, then and in that event, I give, devise and bequeath the said residuary estate remaining in the possession of my said trustee unto the lawful issue of my said son, in equal parts, share and share alike, *per stirpes* and not *per capita*. In the event that my said wife, Fanny Joyce Snow, shall die before me, then and in that event, I give, devise and bequeath the said equal one-half rest, residue and remainder of my personal estate of every name, nature and description and the said one-half part of all of my real estate, unto my son, Elbridge Gerry Snow, Jr., to have and to hold the said real estate to him, his heirs and assigns forever. I authorize and empower my said trustee, at any time during the existence of the trust, to sell and convert any of the said real estate into money and to invest and hold said money as part of the trust estate, and I also authorize and empower my said trustee, in the event that it shall so desire, to lease or mortgage the whole or any part of the said real estate remaining in the trust, and to make, execute and deliver any and all deeds of conveyance, mortgages or leases which may be necessary in the premises."

Thus it appears that by these provisions he left one-half of his residuary estate outright to his son and the other half in trust for the petitioner, with remainder to his son. The final account of the trust company as executor, filed December 18, 1928, shows the net principal of the estate of testator to be $453,431.63, and the principal of the trust set up for the benefit of petitioner, Fanny Joyce Snow, under the 10th paragraph of the will, after the deduction of transfer tax, is $164,438.60. This trust fund will produce approximately, as above noted, $8,700 income per annum.

Petitioner's application is based upon that part of the 10th para-

graph which reads as follows: " If, at any time, the interest and income arising from the said trust estate shall not be *sufficient for the proper support, comfort and maintenance of my said wife, then, and in that event,* I direct, authorize and empower my said trustee to appropriate and make *such payments out of the principal* of the said trust estate as *in its discretion shall be deemed necessary and proper for her liberal and generous support, comfort and maintenance."* (Italics mine.)

Petitioner contends that the income produced by the trust fund during the period from November 7, 1928, the date of death of said deceased, to and including the 10th day of April, 1929, " have been wholly insufficient for the proper support, comfort and maintenance of your petitioner, and the net income upon the said trust for her benefit will continue to be insufficient to provide for the proper support, comfort and maintenance of your petitioner." She further contends as follows:

" 7. The payments of income so made to your petitioner have not enabled her to live and have the maintenance and comforts to which your petitioner was accustomed as the wife of said decedent, and by reason of her lack of means your petitioner has been obliged to deprive herself of many of the ordinary necessities of life, let alone the comforts to which she was theretofore accustomed.

" 8. Said Elbridge Gerry Snow at the time of his decease was President of the Home Insurance Company of New York; President of the Franklin Fire Insurance Company, and President of the City of New York Insurance Company. His annual income at the time of his death and for many years prior thereto was approximately $100,000. He was a director of several banks in the City of New York and of Insurance Companies and other New York Corporations. He was a member of numerous clubs, among them the Lotos Club, the Union League Club, the City Club, the Sleepy Hollow Country Club, the Underwriters' Club, the Automobile Club of America, the Aero Club, the Auto-Polo Club, the Plaza Club, the Economic Club, the Indian Harbor Yacht Club, and the Rye Country Club, and was a member of the American Museum of Natural History, the Mayflower Society, the Chamber of Commerce, the Metropolitan Museum of Art, the New England Society, the Municipal Art Society, Sons of the Revolution, Founders and Patriots of America, the Colonial Society, Horticultural Society, Geographical Society, and numerous other societies and associations.

" 9. For a number of years prior to Mr. Snow's death we occupied a fourteen room apartment in the City of New York during the early fall and spring months, the annual rental of which was approximately $10,000. The wages of the servants regularly employed by

us at this apartment were approximately $8,100 per annum, in addition to their board and maintenance and there were also other occasional employees such as laundress, seamstress, upholsterer, cleaner and the like whose wages approximated $1,700 per annum.

" My husband maintained in New York, a Rolls-Royce limousine, a Renault Town car, and a Pierce Touring car, at the time of his death.

" 10. We were accustomed to go to our winter home in St. Augustine, Florida, for several months each winter, taking servants along and paying their traveling expenses. The upkeep of this Florida home including living expenses, servants, entertainment and the like was approximately $18,000 per year. My husband maintained a Studebaker touring car and had his Rolls Royce limousine there for our use. One chauffeur and numerous other servants were employed regularly, and also other employees such as laundress, gardener and an extra maid.

" I have in my possession receipted bills which show that our grocery bill at St. Augustine for the month of December, 1924, was $195, for March 1925, $196. Our gas bill for December 17 to January 17, 1925, was $89.49; for the period of January 17 to February 17, 1925, $89.68. Our average monthly electric bill was about $30.

" 11. During a period of the year we occupied a summer home in Greenwich, Connecticut, consisting of an estate of about five acres, taking along servants whom we employed in the apartment at New York City, and in addition we employed a gardener, and employees for miscellaneous work, such as laundress and cleaner. The rental of this summer house at Greenwich, Connecticut, was approximately $4,500 per season.

" 12. My husband and I were accustomed to travel extensively. I made trips to and from Florida and New York three times a year. In addition I took frequent pleasure trips to the White Mountains, Lake Champlain, the Adirondacks, Palm Beach and other places and cities. While on these trips we always stopped at the leading hotels such as the Hotel Royal Palm at Miami, the Hotel Ponciana, at Palm Beach, the Waldorf-Astoria at New York, while we were awaiting opening of the apartment, the Stevens House at Lake Placid, the Profile House at White Mountains, the Hotel Champlain, at Lake Champlain, and the Aspenwall Hotel at Lenox, Mass.

" 13. During our marriage my clothing bills approximated $10,000 a year. The use of one car and a chauffeur was always at my disposal and I was accustomed to make wedding presents and other gifts that would approximate about $1,000 per year. I was also accustomed to make large donations for charity annually. My

husband allowed me $300 per month for pin money. He was in the habit of purchasing jewelry for me at a cost of approximately $5,000 per year. I entertained extensively both in New York, at Greenwich and in Florida, and was accustomed to expend in the neighborhood of $5,000 annually to entertain Mr. Snow's friends and my own friends. I always had tickets for the opera and the theatre and the cost of these exceeded $500 per year.

" 14. For some years prior to Mr. Snow's death I had been taking care of my mother, a widow, aged about 73, and my sister, an invalid aged 50, both of whom were without personal means and for whom I have been practically the sole means of support. I was accustomed to advance the sum of $150 per month and upwards to them, and have been obliged to continue to do so since my husband died. My husband was fully acquainted with this situation and understood my obligation to support these relatives and generously approved my doing so.

" Mr. Snow was a man of great generosity. He was always solicitous about my comfort and happiness, and our scale of living was commensurate with his important position in life and such as his means justified.

" 15. In and by his will, my husband bequeathed to me the real property No. 44 Bay Street, St. Augustine, Florida, and also the parcel of land adjoining the same. He had, however, deeded this property to me about three years prior to his death. The structures upon this property consist of a dwelling house, garage, and laundry, with servants' quarters. It was Mr. Snow's desire that this property be maintained by me as a winter home just as it had been maintained during his lifetime. It has, of course, been impossible to sell this property at a fair price owing to economic conditions in Florida.

" My income from the trust fund has not sufficed to enable me to pay the cost of upkeep of the property, taxes and the like, and other expenses which I have had.

" On account of my restricted income I have been obliged to reduce the insurance on the property in Florida, which was formerly carried, and to eliminate windstorm, tornado and water damage insurance, each of which is really necessary on account of climatic conditions in Florida.

" 16. I have not been financially able to maintain a home in New York City since Mr. Snow's death and have lived at St. Augustine. I am now not even able to keep a servant all of the time. At times, I do my own household work, the cooking and sometimes the laundry work. I was forced to expend the $25,000 legacy given me by my husband, for my support and for the upkeep

of my property. The furniture, household goods, personal effects and jewelry bequeathed to me were appraised at $21,764, but when sold at public auction the greater part of this property brought only $4,394. The two watches bequeathed to me by my husband brought only $65.00.

" 17. By reason of the insufficiency of the income upon said trust for my benefit, to provide for my generous support, comfort and maintenance, I am entitled by the terms of my husband's will to receive payments out of the principal of said trust, from said Trustee for those purposes."

The petition and the answer have raised the question whether the refusal to turn over to petitioner $17,000 per annum out of the principal of said trust of approximately $164,000, in addition to the annual income of approximately $8,700, constitutes an abuse of discretion on the part of the trustee. This query leads to two points of discussion, viz.: (1) Is the income of $8,700 per annum " sufficient for the proper support, comfort and maintenance of " petitioner, and (2) if not sufficient, should the trustee have complied with the request of petitioner and have invaded the principal of said trust to the amount of $17,000 annually?

If upon the evidence presented it be concluded that in determining that said income is sufficient for the support, comfort and maintenance of petitioner, there has been no abuse of discretion upon the part of the trustee, then there need be no further discussion or consideration of what payment is " necessary and proper for her liberal and generous support, comfort and maintenance," for, in the paragraph covering this subject, the adjectives " liberal and generous " are not used in the first instance where the phrase " sufficient for the proper support, comfort and maintenance " is set forth. The burden of proof is upon petitioner as to the claim of abuse of discretion.

What are the proofs? The petitioner was the only witness called to support her contentions. Her testimony was substantially along the line developed in her petition, except that the manner and mode of living of her husband and herself, the lavish expenditures for necessaries, comforts and luxuries were described with more detail. (Testimony, pp. 2–123.) She testified also with respect to the expenditures which she has made since her husband's death, of which the following is a summary:

| | |
|---|---:|
| 1926 | $18,124 76 |
| 1927 | 16,167 25 |
| 1928 | 13,912 21 |
| 1929 (first six months of) | 9,927 16 |

In connection with her testimony there were offered in evidence certain tabulations giving the various items of expenditures for each year. They are too lengthy to be included here. It will suffice to insert Exhibit No. 1, covering the period from April 1, 1928, to April 1, 1929, which reads as follows:

| | | |
|---|---:|---:|
| Clothing | $2,660 | 00 |
| Traveling | 1,895 | 00 |
| Taxes, county, State and city | 2,001 | 92 |
| Insurance | 354 | 00 |
| Groceries, vegetables and fruits | 1,782 | 00 |
| Butcher | 748 | 00 |
| Drugs and toilet articles | 320 | 00 |
| Upkeep of automobile | 647 | 00 |
| Electric lights | 123 | 00 |
| Milkman | 120 | 00 |
| Coal and wood | 264 | 00 |
| Water company (also drinking water extra) | 82 | 00 |
| Ice | 62 | 00 |
| Gas for cooking | 148 | 00 |
| Doctor and dentist | 360 | 00 |
| Telephone | 87 | 00 |
| Charity — including church | 356 | 00 |
| Publishers (papers, books, magazines) | 67 | 00 |
| Plumber | 32 | 00 |
| Stationery and Christmas cards | 78 | 00 |
| Dry cleaning | 97 | 25 |
| Chauffeur | 1,250 | 00 |
| Cook | 720 | 00 |
| Laundress | 300 | 00 |
| Garden and yard man (flower seeds, garden tools, etc.) | 460 | 00 |
| Repairs on home — painting and carpenter work | 780 | 00 |
| Household furnishing (window shades, hardware, linen, etc.) | 539 | 00 |
| Wedding presents | 375 | 00 |
| Florist | 118 | 00 |
| Recreation | 325 | 00 |
| | $17,151 | 17 |

The only witness called by the trustee was Mr. George W. Giddings, an assistant vice president of the trust company, who testified that the income from the trust fund is approximately $8,700. He further testified as follows:

By Mr. Howie: " Q. You received, did you not, a demand on

behalf of the beneficiary to be paid an additional amount out of principal, in addition to the income? A. I did. Q. And you considered that demand when you received it? A. We considered it, oh, yes. Q. And you are familiar with the terms of the will of the decedent? A. Yes. Q. And did you determine that the amount of income net from this trust was sufficient to maintain the petitioner, for her comfort and maintenance? A. I did. Q. That is, without regard to whether or not she had any other income? A. Absolutely."

By Mr. Wight: " Q. You say you considered the demand of her request, you considered that, did you? A. Yes. Q. And you thought if she got the sum of $8,700 that was sufficient for her? A. I did. Q. So that the statement which she rendered to you, showing the amount of her expenses, did not sway your judgment one way or the other about that, did it? A. It did not."

Petitioner contends that the proof shows conclusively that the income from the trust is wholly insufficient to furnish petitioner with the support, comfort and maintenance to which she is entitled and that as the wife of Elbridge Gerry Snow she was accustomed to a mode of living consistent with his standing and his income of upwards of $100,000, a mode of living harmonizing with his position in life and in which testator took pride and insisted upon. The trustee, the remainderman and the special guardian contend that there is no proof before the court that the trustee has abused its discretion.

During the hearing it developed that in addition to the bequests of $25,000 and of all testator's books, pictures, silverware and household furniture located in his city apartment, all his jewels, jewelry, watches and automobiles, and in addition to a devise of the real estate in St. Augustine, Fla., testator had given to petitioner various securities of the value, as of October, 1922, of $165,500. Of these securities, those given to petitioner prior to the date of the execution of testator's will were of the value of $100,500. The balance of the securities were given subsequently to that date. Petitioner urges that the trustee was barred from considering, or being influenced by any of these gifts, made either before or after the execution of the will, in determining whether the income of $8,700 per annum was sufficient for the maintenance, comfort and support of petitioner. In support of this contention petitioner relies upon the authority of *Rezzemini* v. *Brooks* (236 N. Y. 184) and other cases. The trustee contends that gifts made after the execution of the will may properly be considered by it in determining whether $8,700 per annum was sufficient for petitioner's maintenance, comfort and support. I hold that under the authorities

sources of income given before the execution of the will should not be considered by the trustee, nor should it be influenced by them in determining the sufficiency of said income. I hold, further, that the trustee would have been justified in taking into consideration gifts made by testator to petitioner after the execution of the will. However, it is in fact not necessary to dwell upon the latter holding for the reason that I have studied, analyzed and determined the issue without taking into consideration any sources of income supplied to petitioner either before or after the making of the will, and it appears from the testimony of trustee's vice-president, Giddings, that the trustee disregarded any other income, viz.: " Q. And did you determine that the amount of income net from this trust was sufficient to maintain the petitioner, for her comfort and maintenance? A. I did. Q. That is, without regard to whether or not she had any other income? A. Absolutely."

Excluding, as above noted, any and all consideration of additional income enjoyed by petitioner, I hold that she has failed to show any abuse of discretion by the trustee that would warrant the court in overruling trustee's determination upon the sufficiency of $8,700 for her support, comfort and maintenance. In reaching this conclusion I have considered the issue in all its aspects. The intentions of testator, as evidenced by his will and by the proofs submitted, have played an important part. Provision for his son and the latter's children and grandchildren, as well as for his wife, surely was a concern that moved him. While he gave his son outright a sum equal to the principal of the trust for his wife, the other provision for his son was in the form of a remainder of the trust for petitioner. For his wife, the provision in the first instance was in the form of a trust. Thus it is clear that he had in mind the protection of both, so that they would not in later years be in want. Yet, in the face of the manifest purpose of testator, petitioner seeks an annual invasion of principal to the amount of $17,000 which, if concurred in by the trustee, will in less than ten years consume the whole corpus of the trust, thus leaving petitioner without any income from this accustomed source and depriving the son of the remainder designed for him by testator.

There is another consideration that shows the wisdom of testator in creating a trust for the widow and in vesting the trustee with the power to determine whether the income of the trust be sufficient for her support, comfort and maintenance. If he ever gave due and deep thought to the subject of making proper provision for his wife and his son — and he doubtless did — he must have realized and known that with his small estate it would be absolutely impossible for her to live in the mode and style in which they had been

living.   He must have realized also that after his death, *with his huge income lacking*, there would be for his widow a rude awakening, when Rolls Royce automobiles, an expensive and luxurious city apartment, summer home and winter home, lavish dress and high-priced recreational and vacational habits could not even be dreamed of.   Had he left to her outright a million dollars — instead of the income of a trust of $164,000 — she would find it impossible to live in such a manner as she did when he was enjoying an income of $100,000, and at the same time be assured that in her declining years she would not suffer want.   The tabulations submitted are illuminating, especially the items for taxes ($2,001.92), insurance ($354), repairs ($780), household furnishings ($539); all of which are doubtless in connection with the St. Augustine property; upkeep of automobile ($647), chauffeur ($1,250), clothing ($2,660), and traveling ($1,895).   After a careful study of the proofs submitted, my conclusion is that there has been no abuse of discretion in the determination that the income of said trust is sufficient for the support, comfort and maintenance of the petitioner.

Application denied.   Submit decree.